UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---------------------------------------------------

DAVID   M.   LUCAS   and   LOUISE   Civil Action No. 17-cv-11472-ADB
LUCAS,

Plaintiffs,

-against-

NEW PENN FINANCIAL, LLC, d/b/a
SHELLPOINT                MORTGAGE
SERVICING,
Defendant.

---------------------------------------------------

## FIRST AMENDED COMPLAINT OF PLAINTIFFS
## DAVID M. AND LOUISE LUCAS

Now come Plaintiffs, David M. Lucas and Louise Lucas, husband and wife (hereinafter "the Lucas'" or "Plaintiffs"), by and through their counsel, and state as follows for their First Amended Complaint against Defendant New Penn Financial, LLC, dba Shellpoint Mortgage Servicing (hereinafter "Shellpoint" or "Defendants"):

## PARTIES, JURISDICTION, AND VENUE

1.    The Lucas' are natural residents of the Commonwealth of Massachusetts and the purported and/or former owners of residential real property, located at, and commonly known as 11 Alden Road, Peabody, Massachusetts 01960 (the "Property").

2.    Shellpoint is a limited liability company with a principal office located at 4000 Chemical Road, Suite 200, Plymouth Meeting, PA 19462.

3.    Shellpoint is a mortgage loan servicer that has servicing responsibilities for

1

the Loan. Shellpoint provides collection and management services on the Loan that is the subject of this action.  Shellpoint performs its services on behalf of non-party Wilmington Savings Fund Society, FSB, dba Christiana Trust, not in its individual capacity but as Trustee for BCAT 2014-9-TT.

4.     Shellpoint's role in pursuing the Plaintiff to collect on the Loan meets the definition of "Servicing" contained in both 12 C.F.R. §1024.02 and in 12 U.S.C. §2605(i)(3).

5.     This Court has jurisdiction pursuant to 28 U.S.C. §1331 as this action arises under the Dodd-Frank Wall Street Reform and Consumer Protection Act (DFA) and the Real Estate Settlement Procedures Act, 12 U.S.C. §§2601, *et seq.* (RESPA). This action is filed, *inter alia,* to enforce regulations promulgated by the Consumer Finance Protection Bureau (CFPB) that became effective on January 10, 2014, specifically, 12 C.F.R. § 1024.35(b) and relevant portions of 12 C.F.R. §1024.41, *et seq.*

6.     This Court has supplemental jurisdiction to hear any and all state law claims that are plead herein or that may subsequently arise pursuant to 28 U.S.C. §1367.

7.     Venue lies in this District pursuant to 28 U.S.C. §1391(b), as Plaintiffs reside and the Property is located in Essex County in the Commonwealth of Massachusetts.

## **INTRODUCTION AND FACTS**

8.     Plaintiffs restate and incorporate all of their statements and allegations contained in the preceding paragraphs in their entirety, as if fully rewritten herein.

9.     Plaintiffs had maintained the Property as their primary, principal residence and family home from July of 2001 through October of 2017.

10.   In or about July of 2001, the Plaintiffs executed a note (the "Note"), and a mortgage on the Property to secure the Note (the "Mortgage"), in favor of, upon information and belief, non-party Citiwide Home Mortgage (collectively the "Loan"). Upon information and belief, the Loan was subsequently sold and securitized into a trust.

11.   The servicing of the Loan was, upon information and belief, originally serviced by Rushmore Loan Management Services, LLC ("Rushmore") until it was transferred, on or about June 1, 2016, to Defendant Shellpoint.

12.   In or about June of 2013, David Lucas suffered a serious medical emergency which resulted in an approximate forty day hospital stay, three surgeries, and nursing care for one year.   The unavoidable physical and economic hardship associated with such injury resulted in the Lucas' default on the Loan.

13.   The Lucas' learned the Property had entered default and upon information and belief, the non-judicial foreclosure process in or about February of 2015.

14.   In May of 2016, Plaintiffs, through Counsel Brian R. Goodwin, Esq. ("Attorney Goodwin" or "the Lucas' Counsel") filed a loss mitigation package with then servicer Rushmore so that the Lucas' might be evaluated for a loan modification (the "Rushmore Application").

15.   After the Lucas' had defaulted on the Loan, and after the May 2016 Rushmore Application had been filed, on or about June 1, 2016 the above referenced transfer of servicing occurred from Rushmore to Shellpoint.

16.   Per public records, a Complaint under the Servicemembers Civil Relief Act was filed against the Lucas' on or about August 9, 2016.

17.   As no action had been taken on the Rushmore Application, and despite

federal regulations protecting against such (see infra), after being informed by Shellpoint that a new application would be needed, on or about December 12, 2016, Plaintiffs, through Attorney Goodwin, filed a new loss mitigation package with Shellpoint so that the Lucas' might be evaluated for a loan modification (the "Application").

18.    The cover letter of the Application clearly identified Attorney Goodwin as counsel for the Lucas'.

19.    Defendant received the Application on December 12, 2016.

20.    Despite clear notification that Defendant was represented by Counsel, including but not limited to numerous oral statements made by the Lucas' to Shellpoint, the Defendants continued to directly contact the Lucas', including but not limited to (1) numerous allegedly harassing telephone calls, (2) a letter dated December 13, 2016; (2) a letter dated December 14, 2016; (3) a letter dated December 16, 2016 (also reiterating that numerous telephone calls had been made directly to the Lucas; and (4) a letter dated January 9, 2017 stating there was a delay in the review of the Lucas' Application.

21.    During many of these telephone calls, Shellpoint acknowledged that the Lucas' were presently represented by counsel.

22.    Between the submission of the Application and April 12, 2017, Attorney Goodwin had numerous conversations with the Defendant, most notably:

  a) on January 18, 2017, where the Lucas' Attorney was informed the file was in review and Shellpoint was merely waiting on an appraisal to be completed;
  b) on February 15, 2017, where the Lucas' Attorney was informed the appraisal had just recently been completed and the file was in review; and
  c) on March 24, 2017, where the Lucas' Attorney was informed by the Lucas' Special Point of Contact, "Ernie Hernandez", that the Lucas' had been approved for a modification and the paperwork would be sent out

shortly.

23.   No mention was made during any of these conversations of a denial of the Application.

24.   During this period of time, no denial letters were received by the Lucas' or Attorney Goodwin.

25.   Immediately prior to the March 24, 2017 conversation, the Lucas' had received notice that a foreclosure sale date had been scheduled for the Property, in alleged violation of the dual tracking provisions of Regulation X, for which Attorney Goodwin was informed by Shellpoint that such would be stayed/postponed upon completion of the trial payment plan documents.

26.   No trial payment plan documents were ever received by the Lucas' nor the Lucas' Attorney.

27.   Between March 24, 2017 and April 12, 2017, subsequent outreaches to Shellpoint were unsuccessful in obtaining any additional information or status updates.

28.   Upon information and belief, and in alleged violation of federal regulations, a sale of the subject property took place on April 12, 2017.

29.   On April 12, 2017, Attorney Goodwin was able to speak with an alleged Supervisor at Shellpoint, who confirmed the sale had occurred and stated that the Special Point of Contact had been on sick leave, or the like.

30.   On April 12, 2017 a Notice of Error pursuant to 12 CFR § 1024.35 was sent to Shellpoint ("4/12/17 NOE") (attached hereto as Exhibit A) and received on April 17, 2017 (see U.S. Postal Mail Certified Mail, Return Receipt Requested, attached hereto as Exhibit B).

31.   No acknowledgement or response to the 4/12/17 NOE was ever received.

32.   Therefore, on May 26, 2017, a new Notice of Error was sent ("5/26/17 NOE"). See 5/26/17 NOE, attached hereto as Exhibit C, without previously attached Exhibits.

33.   No response to the 4/12/17 NOE was received within the 30 days provided by law (nor 45 days allowed if an extension is requested in writing).

34.   No acknowledgement of the 5/26/17 NOE was received by the Lucas' and/or the Lucas' Counsel within the five days provided by federal regulations.

35.   During the week of June 14, 2017, the Lucas' Attorney received a purported response to the 5/26/17 NOE, dated June 9, 2017 but postmarked June 12, 2017 (the "6/14/17 Response"). See 6/14/17 Response, attached hereto as Exhibit D.

36.   General inaccuracies alleged with the 6/14/17 Response include but are not limited to, mistaken conclusions of law (i.e. requirements of the FDCPA), and alleged fabricated scenarios (i.e. the "completion" of review and "denial" of the Application) and documents (i.e. the alleged denial letter from Shellpoint to the Lucas' dated January 11, 2017 ("1/11/17 alleged denial") (See 1/11/17 alleged denial, as exhibit to 6/14/17 Response, attached hereto as Exhibit D).

37.   Plaintiffs further state that the CFPB Loss Mitigation rules explicitly require the servicer to state the specific reason(s) for denial, with the Bureau's Official Interpretations giving an example that "investor requirement" is insufficient.

38.   Defendants contend the "reasons" for denial given in the alleged denial – reiterating again that Plaintiffs contend said alleged denial was never actually sent – do not fall within the specificity requirements.

39.   Finding these numerous errors with the 6/14/17 Response, the Lucas'

Attorney sent a Demand Letter pursuant to the Massachusetts Consumer Protection Act, M.G.L. c. 93A on July 3, 2017 (the "July 3, 2017 Demand Letter", attached hereto as Exhibit E, without previously attached exhibit).

40.   Key allegations contained within the July 3, 2017 Demand Letter include:

a)   Violations of the dual tracking prohibitions of Regulation X;
b)   Violations of the notice requirements of Regulation X;
c)   Violations of the FDCPA., and
d)   General unfair and deceptive practices in the servicing of the Lucas' mortgage and review of the Application.

See Id.

41.   As of the date of this Complaint, no reasonable response has been received.

42.   The Defendant wrongfully proceeded to pursue a sale of the Property even though the Plaintiffs submitted the Application on December 12, 2016, well in advance of thirty-seven (37) days prior to the scheduled foreclosure sale.

43.   Pursuant to an eviction commenced in Peabody District Court, captioned Gaspar Investment Inc. vs. David M. Lucas, et al., 1786-SU-0027, and later transferred to the Northeast Housing court, 17H77SP002723, the Lucas' were subsequently evicted from the Property.

44.   Even with an emergency stay of eviction granted, the Lucas' were forced to rush in order to achieve new housing, leading to further complications including familial confrontations.

45.   Louise Lucas has previously been diagnosed with dementia and the added stress and circumstances as described above have severely aggravated her condition.

46.   Given the aggravated condition of Louise's dementia, David has found himself incapable of caring for his long-time wife outside of their original family home

and has been forced to place Louise in an assisted living facility.

47. David was forced to initial contact Massachusetts Protective Services, who had Louise placed at Peabody Lahey Medical Center; later to be transferred to Beverly Hospital, then on to Brentwood Rehabilitation and Healthcare Center, then Salem Hospital, and now at McLean Hospital, where she may be transferred yet again.

48. Given the shortness of time and the circumstances forced to be dealt with, David feels he was unable to procure the ideal living conditions for his long-time wife and further complications and difficulties have emerged, including severe familial confrontations faced by himself and the Lucas' son.

49. Given the locations, David is forced to drive by the Subject Property on a nearly daily occurrence.

50. David has also suffered severe emotional distress resulting from the above described actions, leading to the necessity of his seeking professional psychological counseling and increased medical difficulties.

51. As a result of Shellpoint's actions as described above, Plaintiffs and their child were directly caused to suffer (and continue to suffer from) severe actual damages, including but not limited to the fear of living in foreclosure, the ultimate loss of their family home, eviction from their long-time family home, personal humiliation, embarrassment, mental anguish or emotional distress, and the ultimate division of the family unit.

52. The Lucas' have further suffered significant economic harm including but not limited to the securing of new residences, hiring counsel for multiple legal actions, and the costs associated with all of the above facts.

53.   Plaintiffs have further suffered from sleeplessness, depression, aggravated high blood pressure, increased anxiety, and strain upon both their marriage and family life as a result of Defendant's actions.

54.   As of July 17, 2017, nearly 600 consumer complaints had been filed against Shellpoint with the Consumer Financial Protection Bureau (CFPB) in relation to the issue(s) identified by the CFPB as "[l]oan modification, collection and foreclosure;" and nearly 500 consumer complaints have been filed against Shellpoint in relation to the issue(s) identified by the CFPB as "[l]oan servicing, payments and escrow account." The CFPB's consumer complaint database can be accessed at the following hyperlink: http://www.consumerfinance.gov/complaintdatabase/.

## COUNT ONE: VIOLATION OF 12 U.S.C. 2605(f)

### (Violation of C.F.R. § 1024.41(b) and for failure to Review the Application)

55.   Plaintiffs restate and incorporate all of their statements and allegations contained in the preceding paragraphs in their entirety, as if fully rewritten herein.

56.   Shellpoint had an affirmative duty under 12 C.F.R. § 1024.41 to promptly review the Lucas application.

57.   12 C.F.R. §1024.41 provides in relevant part:

(b) (2) (i) "If a servicer receives a loss mitigation application 45 days or more before a foreclosure sale, a servicer shall: (A) *Promptly* upon receipt of a loss mitigation application, review the loss mitigation application to determine if the loss mitigation application is complete; and (B) Notify the borrower in writing within 5 days (excluding legal public holidays, Saturdays, and Sundays) after receiving the loss mitigation application that the servicer acknowledges receipt of the loss mitigation application and that the servicer has determined that the loss mitigation application is either

complete or incomplete." *Emphasis added*.

    (c) (1) "If a servicer receives a complete loss mitigation application more than 37 days before a foreclosure sale, then, within 30 days of receiving a borrower's complete loss mitigation application, a servicer shall: (i) Evaluate the borrower for all loss mitigation options available to the borrower; and (ii) Provide the borrower with a notice in writing stating the servicer's determination of which loss mitigation options, if any, it will offer to the borrower on behalf of the owner or assignee of the mortgage.

    58.  12 C.F.R. § 1024.41, *et seq.*, was promulgated by the CFPB, in large measure, to codify portions of the National Mortgage Settlement, and especially to prevent mortgage servicers from the pernicious practice of "dual tracking" borrowers seeking loan modifications while foreclosure actions were pending. As summarized in a CFPB's regulatory report, numerous illegal activities by servicers were catalogued, including "[i]llegal dual tracking of foreclosures and loss mitigation applications"; "[i]llegal runarounds with loss mitigation applications"; and "[d]ebt collection complaints disregarded".

"CFPB Identifies Illegal Practices Uncovered Through Supervision," June 23, 2015; referencing CFPB's *Supervisory Highlights, Summer 2012.* Available at: http://www.consumerfinance.gov/newsroom/cfpb-identifies-illegal-practices-uncovered-through-supervision/

    59.  In addressing why errors related to loss mitigation were not specifically included in the list of covered errors under 12 C.F.R. § 1024.35(b), the CFPB stated that "§ 1024.35(b)(11)...includes a catch-all that defines as an error subject to the requirements of §1024.35 errors relating to the servicing of a borrower's mortgage loan. The Bureau believes that any error related to the servicing of a borrower's mortgage loan also relates to standard servicer duties."). Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act (Regulation X), 78 Fed. Reg. 10696-01.

60. The CFPB further stated that "[s]ervicers' duties typically include billing borrowers for amounts due, collecting and allocating payments, maintaining and disbursing funds from escrow accounts, reporting to creditors or investors, and pursuing collection and *loss mitigation activities (including foreclosures and loan modifications*) with respect to delinquent borrowers." Id. (emphasis added).

61. The Application was deemed received by Shellpoint "more than 90 days before any foreclosure sale" since the application was received prior to the "scheduling" or "rescheduling" of any sale. See Official Bureau Interpretations, 12 CFR Pt. 1024, Supp I, 41(b)(3), Determining Protections.

62. The Lucas', nor their attorney, ever received any requests for additional information, nor the alleged denial.

63. Shellpoint failed and refused to timely review the Application in violation of 12 CFR 1024.41(b)(2)(A).

64. As a result of Defendants continuous actions, the Plaintiffs lost their home to an illegally conducted foreclosure sale of their property. Defendant violated numerous provisions of 12 C.F.R. §1024.41 including but not limited to: 12 C.F.R. §§1024.41(b)(2)(B); (c)(2); (c)(2)(iv); (d); (g); and (h).

65. 12 C.F.R. § 1024.41(a) explicitly provides that "[a] borrower may enforce the provisions of this section pursuant to section 6(f) of RESPA (12 U.S.C. 2605(f))."

66. Pertinent Sections of Regulation X cited here were promulgated pursuant to §6 of RESPA (12 U.S.C. 2605(f)) and thus subject to RESPA's private right of action, which entitles a successful plaintiff to damages and attorney's fees, and in the case of a pattern or practice of noncompliance, statutory damages of $2,000.

67.   Shellpoint, failed in their duty to act with reasonable diligence in assessing the Application.

68.   Shellpoint's actions are believed to be a pattern and practice of behavior in conscious disregard for Plaintiffs' rights.

69.   The Lucas' sustained numerous damages due to Shellpoint's actions as described above.

70.   As a result of Shellpoint's actions, the Defendant is liable to Plaintiffs for actual damages, as well as for statutory damages, costs, and attorneys' fees.

## COUNT TWO: VIOLATION OF 12 U.S.C. 2605(f)

**(Violation of C.F.R. § 1024.41(c) for failure to Evaluate All Loss Mitigation Options)**

71.   Plaintiffs restate and incorporate all of their statements and allegations contained in the preceding paragraphs in their entirety, as if fully rewritten herein.

72.   12 C.F.R. § 1024.41(c)(2)(iv) provides, in relevant part:

> *If a borrower submits all the missing documents and information as stated in the notice required pursuant to § 102[4].41(b)(2)(i)(B), or no additional information is requested in such notice, the application shall be considered facially complete* [emphasis added]. If the servicer later discovers additional information or corrections to a previously submitted document are required to complete the application, the servicer must promptly request the missing information or corrected documents and *treat the application as complete for the purposes of paragraphs (f)(2) and (g) of this section until the borrower is given a reasonable opportunity to complete the application* [emphasis added]. *If the borrower completes the application within this period, the application shall be considered complete as of the date it was facially complete, for the purposes of paragraphs (d), (e), (f)(2), (g), and (h) of this section*, and as of the date the application was actually complete for the purposes of

> paragraph (c). A servicer that complies with this paragraph will be deemed to have fulfilled its obligation to provide an accurate notice under paragraph (b)(2)(i)(B).

73. Plaintiffs submitted the Application to Shellpoint on or about December 12, 2016.

74. Shellpoint subsequently acknowledged receipt of the complete Application via a letter dated December 14, 2016.

75. Plaintiffs, or their counsel, notwithstanding the general communications listed above, never received any further correspondence from Shellpoint specifically regarding or addressing the Application prior to receiving the 6/14/17 Response.

76. The Plaintiff's contend that Shellpoint did not send any correspondence related to the review of the Application, namely any denial nor requests for further information, to Plaintiffs nor their counsel, until the 6/14/17 Response.

77. As no further requests were made, the Application was deemed to be facially complete in accordance with 12 C.F.R. § 1024.41(c)(2)(iv).

78. 12 C.F.R. §1024.41(g) states in relevant part:

> If a borrower submits a complete loss mitigation application after a servicer has made the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process but more than 37 days before a foreclosure sale, a servicer shall not move for foreclosure judgment or order of sale, or conduct a foreclosure sale, unless:
>
> (1) The servicer has sent the borrower a notice pursuant to paragraph (c)(1)(ii) of this section that the borrower is not eligible for any loss mitigation option and the appeal process in paragraph (h) of this section is not applicable, the borrower has not requested an appeal within the applicable time period for requesting an appeal, or the borrower's appeal has been denied;
>
> (2) The borrower rejects all loss mitigation options offered by the servicer; or

(3) The borrower fails to perform under an agreement on a loss mitigation option.

79.   Comment 1 of the Official CFPB Interpretations to 12 C.F.R. §1024.41(b)(3) provides:

1.   If no foreclosure sale has been scheduled as of the date that a complete loss mitigation application is received, the application is considered to have been received more than 90 days before any foreclosure sale.

2.   The protections under §1024.41 that have been determined to apply to a borrower pursuant to §1024.41(b)(3) remain in effect thereafter, even if a foreclosure sale is later scheduled or rescheduled.

80.   A foreclosure sale was conducted on April 12, 2017.

81.   As of March of 2017, pursuant to direct conversations between the Lucas' Attorney and Shellpoint, the Lucas' had received an offer of modification and the paperwork would be subsequently sent.

82.   No paperwork regarding an offer of loss mitigation was ever received, and, upon information and belief, no paperwork concerning the same was ever sent.

83.   Shellpoint's actions are believed to be a pattern and practice of behavior in conscious disregard for Plaintiffs' rights.

84.   As a result of Shellpoint's actions, the Defendant is liable to Plaintiffs for actual damages, as described, as well as for statutory damages, costs, and attorneys' fees.

**COUNT THREE: VIOLATION OF 12 U.S.C. 2605(f)**

**(Violation of C.F.R. § 1024.41(g) for Engaging in "Dual Tracking")**

85.   Plaintiffs restate and incorporate all of their statements and allegations contained in the preceding paragraphs in their entirety, as if fully rewritten herein.

86.   Shellpoint has violated 12 C.F.R. §1024.41(g) as the Defendant failed to service notice, prior to conducting the April 12, 2017 foreclosure sale, that the Lucas were not eligible for any loss mitigation option and that the appeal process was either not applicable or had not been requested.

87.   Moreover, at no point prior to the foreclosure sale on April 12, 2017 had Plaintiffs officially rejected all loss mitigation options offered by Shellpoint, nor had Plaintiffs failed to perform under an agreement on a loss mitigation option, as there was none fully provided.

88.   Shellpoint engaged in dual tracking as proceeding through a foreclosure process including, but not limited, the alleged sale of the Property, while the Plaintiffs were in the loss mitigation process.

89.   As such, it is clear that Shellpoint's actions, in conducting the foreclosure sale on or about April 12, 2017, were in clear violation of 12 C.F.R. § 1024.41(g).

90.   Shellpoint's actions are believed to be a pattern and practice of behavior in conscious disregard for Plaintiffs' rights.

91.   As a result of Shellpoint's actions, the Defendant is liable to Plaintiffs for actual damages, as described, as well as for statutory damages, costs, and attorneys' fees.

### COUNT FOUR: VIOLATION OF 12 C.F.R. § 1024.35(d)

### (Failure to acknowledge receipt of a notice of error)

1.   Plaintiffs restate and incorporate all of their statements and allegations

contained in the preceding paragraphs in their entirety, as if fully rewritten herein.

2.   12 C.F.R. §1024.35(d) states:

> Within five days (excluding legal public holidays, Saturdays, and Sundays) of a servicer receiving a notice of error from a borrower, the servicer shall provide to the borrower a written response acknowledging receipt of the notice of error.

3.   As stated above, Plaintiffs, through counsel, sent a Notice of Error to Shellpoint on or about April 12, 2017.

4.   Shellpoint received the NOE on or about April 17, 2017.

5.   Pursuant to 12 C.F.R. §1024.35(d), on or before April 24, 2017, Shellpoint was required to provide a written response acknowledging receipt of the NOE to Plaintiffs.

6.   To date, Plaintiffs have not received any correspondence specifically acknowledging Shellpoint's receipt of the 4/12/17 NOE.

7.   Shellpoint did not send any correspondence acknowledging their receipt of the NOE to Plaintiffs within five (5) business days of their receipt of the NOE, as required under 12 C.F.R. §1024.35(d).

8.   Defendant's multiple and material violations of 12 C.F.R. §1024.35, et seq. create a private right of action in favor the Plaintiffs entitling them to actual damages, statutory damages of up to $2,000 per violation, and their costs and attorney fees.

9.   As such, it is clear that Shellpoint's actions, in failing to send correspondence acknowledging their receipt of the NOE to Plaintiffs within five (5) business days of their receipt of the NOE, were in clear violation of 12 C.F.R. § 1024.35(d).

10.   Shellpoint's actions are believed to be a pattern and practice of behavior in conscious disregard for Plaintiffs' rights.

11.   In addition to the added costs of additional certified letters and attorney hours, Shellpoint's actions resulted in direct harm and damages to the Lucas', as described above, including but not limited to, halting any further options available to Plaintiffs (such as filing for relief under the Bankruptcy Code).

12.   As a result of Shellpoint's actions, the Defendant is liable to Plaintiffs for actual damages, as well as for statutory damages, costs, and attorneys' fees.

## COUNT FIVE: VIOLATION OF 12 C.F.R. § 1024.35(e)

### (Failure to properly respond to a notice of error)

13.   Plaintiffs restate and incorporate all of their statements and allegations contained in the preceding paragraphs in their entirety, as if fully rewritten herein.

14.   12 C.F.R. §1024.35(e)(1)(i) provides:

> Except as provided in paragraphs (f) and (g) of this section, a servicer must respond to a notice of error by either:
> (A) Correcting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance; or
> (B) Conducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.

15.   Plaintiffs sent the NOE to Shellpoint on or about April 12, 2017.

16.   Shellpoint received the NOE on or about April 17, 2017.

17.   Shellpoint sent the 6/14/17 Response to Plaintiffs on or about July 12, 2017.

18.   By and through the 6/14/17 Response, Shellpoint denied that the Defendant had committed any errors in relation to the Loan as alleged by and through the 4/12/17 NOE, never addressing the issues raised in the 5/26/17 NOE.

19.   As such, it is clear that Shellpoint did not comply with 12 C.F.R. § 1024.35(e)(1)(i)(A) as no error was corrected.

20.   Furthermore, as stated above, the Lucas' believe Shellpoint used the excessive time in responding to fabricating information and documentation.

21.   Given the foregoing, in order to comply with the requirements of 12 C.F.R. § 1024.35 in relation to the 4/12/17 NOE, Shellpoint was required to respond in compliance with the explicit requirements of 12 C.F.R. § 1024.35(e)(1)(i)(B).

22.   Shellpoint, however, did not address how and why Plaintiffs' foreclosure case was not "suspended" beginning on December 12, 2016, when Shellpoint received the initial loss mitigation application; nor how and why the foreclosure sale on April 12, 2017 was conducted without reference to the Plaintiffs' still-pending application for loss mitigation assistance.

23.   12 C.F.R. § 1024.35(e)(1)(i)(B) provides that upon receiving the NOE, the servicer must conduct a *reasonable investigation* and, if it finds no errors, *explain the reason(s) for how it arrived at such a conclusion*.

24.   Rather than complying with the requirements of 12 C.F.R. § 1024.35(e)(1)(i)(B), Shellpoint failed to conduct a reasonable investigation and instead merely relied upon a recitation of its own erroneous conclusions and, upon information

and belief, intentionally fabricated information and documentation.

25.   Defendant Shellpoint's actions, in failing to fully respond to the 4/12/17 NOE in compliance with the explicit requirements of either 12 C.F.R. § 1024.35(e)(1)(i)(A) or 12 C.F.R. § 1024.35(e)(1)(i)(B), constitute a clear violation of 12 C.F.R. § 1024.35(e).

26.   Shellpoint's actions are believed to be a pattern and practice of behavior in conscious disregard for Plaintiffs' rights.

27.   As a result of Shellpoint's actions, the Defendants suffered actual damages, including attorney's fees, and as further described above, including but not limited to, halting any further options available to Plaintiffs (such as filing for relief under the Bankruptcy Code).

28.   As a result of Shellpoint's actions, the Defendant is liable to Plaintiffs for actual damages, as described, *supra*, as well as for statutory damages, costs, and attorneys' fees.

## COUNT SIX: DEBT COLLECTION

### (The Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq.)

29.   Plaintiffs restate and incorporate all of their statements and allegations contained in the preceding paragraphs in their entirety, as if fully rewritten herein.

30.   The Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq. ("FDCPA"), was enacted, among other things "to eliminate abusive debt collection practices by debt collectors … and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e).

31.   To those ends, and relevant to this action, 15 U.S.C§ 1692d provides, in

relevant part:

> A debt collector may not engage in any conduct the natural
> consequence of which is to harass, oppress, or abuse any person in
> connection with the collection of a debt.

32.   15 U.S.C. § 1692f provides, in pertinent part:

> A debt collector may not use unfair or unconscionable means to collect any

debt... .

33.   15 U.S. Code § 1692c(a) specifically states:

> Without the prior consent of the consumer given directly to the debt
> collector or the express permission of a court of competent jurisdiction, a
> debt collector may not communicate with a consumer in connection with the
> collection of any debt— ... (2) if the debt collector knows the consumer is
> represented by an attorney with respect to such debt and has knowledge of,
> or can readily ascertain, such attorney's name and address, unless the
> attorney fails to respond within a reasonable period of time to a
> communication from the debt collector or unless the attorney consents to
> direct communication with the consumer

34.   The Lucas' are "consumer's" as that term is defined under 15 U.S.C. §

1692a(3).

35.   The Lucas' incurred a financial obligation that was primarily for family,

personal or household purposes, and which meets the definition of a "debt" under 15

U.S.C. § 1692a(5).

36.   Given the Lucas' were already in default when servicing of the Loan was

transferred from Rushmore to the Defendant, Shellpoint is a "debt collector" as that term

is defined under 15 U.S.C. § 1692a(6), and, based upon information and belief, including

a conversation with the Massachusetts Division of Banks, is licensed as a "debt collector,

loan servicer" in the Commonwealth of Massachusetts, MLS # 3013 .

37.   As noted above, Shellpoint, despite knowing or having reason to know, the Lucas' were represented by counsel, made numerous direct contacts with the Plaintiffs, including both oral and written correspondence.

38.   The Plaintiffs further contend that Shellpoint made "false, deceptive, or misleading representation or means in connection with the collection of any debt," as described above, including but not limited to the alleged offering of a trial plan but failure to provide such documentation and foreclosing and selling the Property during this period.

39.   Plaintiffs contend Shellpoint's above referenced behavior was "conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt."

40.   Plaintiffs allege that by foreclosing and selling the property in violation of the dual tracking prohibitions of Regulation X, the Defendant violated 15 U.S.C. § 1692f(1) by attempting to collect upon a debt in a manner not permitted by law.

41.   The Plaintiffs were severely injured by Defendant's conduct as described above.

42.   "The FDCPA imposes strict liability on debt collectors for their violations [and]. . . [p]laintiff need only show a violation of one of the FDCPA's provisions to make out a prima facie case." Harrington v. CACV of Colo., LLC, 508 F.Supp.2d 128, 132 (D.Mass.2007).


## COUNT SEVEN: UNFAIR & DECEPTIVE PRACTICES

## (Consumer Protection Act, M.G.L. c. 93 § 49 and M.G.L. c. 93A)

43. Plaintiffs restate and incorporate all of their statements and allegations contained in the preceding paragraphs in their entirety, as if fully rewritten herein.

44. M.G.L. c. 93 § 49 prohibits the collection or attempted collection of a debt in an unfair, deceptive or unreasonable manner.

45. Plaintiff's state the above facts show Shellpoint violated M.G.L. c. 93 §49, by attempting to collect a debt in an unfair, deceptive or unreasonable manner.

46. A violation of M.G.L. c. 93 § 49 is also a violation of M.G.L. c. 93A.

47. Shellpoint had an affirmative duty under 12 C.F.R. § 1024.38(b)(4) to "identify necessary documents or information that may not have been transferred by a transferor servicer and obtain such documents from the transferor servicer".

48. This duty is specifically detailed by the Official CFPB Interpretations:

> the new servicing rule requires servicers, among other things, to maintain policies and procedures that are reasonably designed to achieve the objective of properly evaluating loss mitigation applications. There is heightened risk inherent in transferring loans in loss mitigation, including the risk that documents and information are not accurately transferred. …

> As a transferee, requiring that the transferor servicer supply a detailed list of loans with pending loss mitigation applications, as well as approved loss mitigation plans.

> As a transferee, requiring that appropriate documentation for loans with pending loss mitigation applications, as well as approved loss mitigation plans, be transferred preboarding. …

> As a transferee, ensuring receipt of information regarding any loss mitigation discussions with borrowers, including any copies of loss mitigation documents. ….

> A transferee that, following a transfer, requires borrowers to resubmit loss mitigation application materials is unlikely to have policies and procedures that comply with 12 CFR 1024.38(b)(4). …

A transferee that, following a transfer, fails to properly evaluate borrowers who submit loss mitigation applications is unlikely to have policies and procedures that comply with 12 CFR 1024.38(b)(2)(v).

"Compliance Bulletin and Policy Guidance: Mortgage Servicing Transfers," August 19, 2014. Available at: http://files.consumerfinance.gov/f/201408_cfpb_bulletin_mortgage-servicing-transfer.pdf

49.   Shellpoint failed in their duty to act with reasonable diligence in acting upon or, upon information and belief, even obtaining the Rushmore Application.

50.   As discussed in detail above, Shellpoint had numerous additional duties under Regulation X of the Real Estate Settlement Procedures Act, which Shellpoint failed to act with reasonable diligence. Furthermore, 12 CFR 1024.38 specifically states that "[a] servicer shall maintain policies and procedures that are reasonably designed to achieve the objectives set forth in paragraph (b) of this section."

51.   Taken as a whole, the Plaintiff's contend all of the above referenced actions by the Defendant were unfair and deceptive in violation of M.G.L. c. 93A.

52.   At all relevant times, Defendant was engaged in trade or commerce in Massachusetts within the meaning of M.G.L. c. 93A, §1.

53.   The Lucas' are "consumers" and the Loan and servicing thereof in question were consumer transactions as contemplated by M.G.L. c. 93A.

54.   Defendant engaged in unfair and deceptive practices, as set forth above, in violation of M.G.L. c. 93A, §2.

55.   Defendant's unlawful conduct was knowing and/or willful within the meaning of M.G.L. c. 93A, §9.

56.   The Lucas were injured in many ways by Defendant's actions, as stated above, including but not limited to, loss of their family home, personal humiliation, breaking up of the family dynamic, embarrassment, mental anguish or emotional distress.

57.   On July 3, 2017, Plaintiff through counsel sent Defendant a demand for relief pursuant to M.G.L. c. 93A, §9.  Thirty days have elapsed since Defendant receipt of Plaintiff's Demand, and Defendant has not made a reasonable tender of settlement.

58.   Defendant's refusal to make a timely, reasonable and written tender of settlement was in bad faith with knowledge or reason to know that its conduct violated M.G.L. c. 93A, §2.

## COUNT SEVEN: MISREPRESENTATION

### (Intentional and/or Negligent)

59.   Plaintiffs restate and incorporate all of their statements and allegations contained in the preceding paragraphs in their entirety, as if fully rewritten herein.

60.   As stated above, the Defendant made numerous statements Plaintiffs' contend knew or should have known that such representations were false.

61.   The Lucas' reliance was reasonable or justifiable in the circumstances, including but not limited to foregoing their right to file for relief under the U.S. Bankruptcy Code, due to their belief that a loan modification was "on its way".

62.   The Lucas' were severely injured based on the intentional and/or negligent misrepresentations of the Defendant.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter its order granting judgment for the following:

A.) For actual damages, costs, and reasonable attorneys' fees;

B.) For statutory damages pursuant to 15 U.S.C. § 1692k(a)(2) and c. 93A, §9;

C.) Award multiple damages pursuant to M.G.L. c. 93A § 9;

D.) Award punitive damages;

E.) Declare that the abusive collection practices set forth above violate the law and the underlying foreclosure and/or sale of the Property unlawful and therefore void;

F.) Award reasonable attorney's fees and costs pursuant to 15 U.S.C. § 1692k(a)(3) and c. 93A, §9; and

G.) Grant such other relief as this Court deems equitable and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, Plaintiffs demand trial by jury in this action of all issues so triable.

Dated:  1/30/2018

Respectfully submitted,
DAVID M. LUCAS AND LOUISE LUCAS,
By their attorneys,


/s/  Brian R. Goodwin
Brian R. Goodwin, BBO #657251
Goodwin Law Firm
One East Main St., 10th Floor
Rochester, New York 14614

585 353 7084 (tele)
888 395 7296 (fax)
Brian.GoodwinLaw@gmail.com (e)